Good morning, Your Honors. My name is A.J. Stone. Mr. Stone, I think you should unmask for the benefit of Judge Roth, who is a little tough to hear through that. Absolutely, Your Honor. Thank you. You're welcome, Your Honor. May it please the Court, my name is A.J. Stone, a Bolton Aggie PC, arguing today on behalf of rebuttal. Thank you. Your Honors, this is a direct appeal from a judgment of the District Court of the Virgin Islands. In that judgment, the District Court concluded that my client, Crown Bay Marina, did not prove by preponderance of the evidence that two 27-foot tugboats, owned and operated by Pele Reef Transportation, damaged Crown Bay's docks when those vessels were improperly tied up in advance of Hurricane Maria, I'm sorry, Hurricane Irma back in 2017. Yeah. The District Court, where are you? We got the facts down and the procedural history, so let's ask you some questions. One of the things that you're complaining about is that the Court, as I understand it, you're upset about the Rule 16 conference and an assertion that it was error for the Court to first consider the Rule 16 and then consider the paddy pack factors. You think there's some conflation. What, how is it, how is it error for the Court to have handled that in that order? It wasn't a problem for the Court to handle it in that error. The error came in when the Court conflated the Rule 37 standard for determining whether a sanction was appropriate, whether exclusion of evidence was an appropriate sanction for the violation of the Court's discovery orders, in place of the Rule 16 standard, which is simply determining whether there's good cause to allow amendment of the scheduling order. Well, help us, help me understand. I don't want to speak for anybody else. It looked to me like... I need some help too, Judge Jordan. Yeah, it looked to me like the Court just said, all right, I'm looking at the Rule 16 thing here just to figure out whether, in fact, there was a violation of my order. And then I'm looking at that seemed to me a perfectly sensible way to deal with it. Why is, what is it that the Court said that makes you think, oh no, there was a conflation there and the Court had no right to do what it did? The thing that jumped out when we were reviewing the Court's order on this, the Court's memorandum on this, the Court specifically said that the exclusion of an cavalier treatment of its discovery obligations. Now, what Pennypack is used for is to help inform the Court's determination as to whether good cause exists. What happened in this case, when the District Court was looking at this, rather than give that fifth element of Pennypack its due, which was the, Pennypack says that the fifth element, the importance of the evidence, is the prime, it's the prime consideration that a Court must look at. What the Court did was consider it under a Rule 37 standard, taking as a given that there had been discovery, a discovery order, that Crown Bay had not complied with its discovery obligations, that there had been a motion to compel, that the, a motion granting, I'm sorry, an order granting the motion to compel was entered, and then Crown Bay failed to comply with that order. That's the approach that the Court took to this, whereas the Rule... Assuming that's, assuming we thought that that was an accurate characterization, is all that irrelevant to the Court's consideration of your coming forward with an expert at, well, well, well past the deadline? Your Honor, it is perfectly, perfectly acceptable for the District Court to take all that into consideration. It's, it's perfectly acceptable for the Court to look at Pennypack to determine whether in the range of whether we're dealing with prejudice, whether we're dealing with, whether that's curable, all the elements of Pennypack balanced against the importance of the evidence to determine whether there's good cause. So at the end of the day, your, your argument boils down to, this was really important and, and we don't like how the Court weighed the importance against the other Pennypack factors. Your Honor, I would characterize it more as the Court applied Pennypack as if we were dealing with a, a violation of a standing Rule 37 order, which was not the case. This was a Rule 16 motion to, or to extend... It was a request to let us bring in another expert very late in the game. But, okay. Setting, setting that aside for a moment, can you, can you help me with another point here, which goes more to the, the question of your, your effort to disqualify Reefs Council, because you, you, you're at that pretty hard too in this briefing. This is again a, an abuse of discretion call, right? Correct, yeah. All right. So, and, and would you agree that our case law says that you have a, a heavy burden in this context to show an abuse of discretion? That's the ZF Meritor. The Meritor case, yes, Your Honor. Yes, absolutely. Okay. So if the Court looks at this and says, based on something that happened two decades earlier, and having heard evidence, I just don't think there's enough there to say there was confidential information passed, and even if there was, it's so attenuated. Where's the abuse of discretion in, in viewing that in that manner? The abuse of discretion arose in the determination that this was a question of application of the license, the docking agreement, as opposed to the enforcement of the docking agreement. The fact of the matter is that the, that Reefs Council had been the ones who reviewed the original docking agreement, that were the ones that were tasked with reviewing the docking agreement to make sure that there was sufficient, that, that it was, that it was a complete, that it was enforceable, that it was useful to the client. So, all right. And did you, the Court also seemed to say that you'd waived this, that you just had let, you'd sat on this and you waived your rights. Did you address that argument in your briefing to us? Yes, Your Honor, we did. We pointed out that the, the waiver, the bringing this up late from the District Court's perspective was occasioned by the threats that Mr. Kosayona, who's the principal of Crown Bay Marina, received from his previous counsel, telling him, in another case, if you continue with your efforts to have my firm disqualified from, from, from representing someone against you, we're going to report you to the Virgin Islands Attorney General for prosecution for unauthorized practice of law. And we're going to report any attorneys that help you to the Virgin Islands Bar for sanctions. So, based, what legitimate non, non-tactical reason, what, what, what basis is there for raising this a month before trial? At that point, it became clear in the motion for summary judgment briefings that Reif was going to, was challenging, you know, head-on in challenging the enforceable, enforceability of the docking agreement. That was something that was raised way earlier in the case. I don't, when you say it became clear, what in the earlier course of this case, like, from the jump made it unclear to your people that the, that that was something that was at issue? Only because it had not been discussed. This was the first time that ever any briefing, any, any argumentation had been raised on that. It was raised as an affirmative defense way back in the beginning. In the answer. So you litigate for two years and then a month before trial, bring this motion. I'm just, how is that, how is that not a waiver? They raise it in their, in their pleading. You say nothing. A month before trial, you bring a motion. Now give me some case, some something, anywhere that says you can sit on your rights for two years and then try to disqualify the other side's lawyer a month before trial. This was not a strategic approach from the client's perspective. Well, that's why I'm asking you. I just, I asked you that exact thing. What non-strategic, non-tactical, legitimate reason can you put forward for waiting two years and then a month before trial springing it? Fear, your honor, the absolute fear that pre that their counsel had previously threatened my client with prosecution. If he tried to disqualify them in another case and threatened that they would refer as attorneys to the, to the, to the bar for sanctions. This was not something where, what's the matter with that? Why should you be afraid of that? If you've done nothing wrong, seems a rather lame excuse if you ask me. It may, I can understand where it would, your honor. I can understand where someone, those of us who were attorneys, we understand that is not a, come on, we're not taking that seriously. That's bluffing. That's that's, that's just simply trying to argue. I suppose you would say you would be, you would be arguing on behalf of your client at the time trying to fend off a challenge from the other, from your, from your previous client of a, of a potential conflict. The, but for a lay person like my client, this is something being, being referred to the U.S. attorney's office. I'm sorry, the Virginia attorney general's office. Your client should have discussed it with his current attorney. And if that was unsatisfactory, he had found another attorney. Your honor, I see my time is almost expired. May I address that? Let me ask you another question, if I may, about rule 16 and considering that the lateness of a request for, to bring in another witness, does that not have to be considered in the context, the importance of the testimony? Does it not have to be considered in the context of the whole surrounding trial and, and the previous discovery orders, et cetera. In other words, it's not just a fact that is considered by itself. It's a fact that is considered in the context of the trial proceedings that have been ongoing for two years, right? Correct your honor. And did not the district court do that? The district court did that in the sense that it was, it was taking the, the, the, the lateness of the request into consideration, but employing it in a punitive, you know, the sanction was punitive in this case, it was meant to punish the, punish my client for perceived previous, you know, this is simply a continuation. Is there anything that says it's punitive? I'm sorry. Does the judge say this is being imposed in a punitive manner, or does the judge say this is being imposed because it's too late? The judge says it is appropriate result given Crown Bay's cavalier treatment of its discovery obligations. And there was no, there was that to, but the Crown Bay had not been cavalier in its discovery obligations. Well, I have read the facts of this case and I find that Crown Bay had been fairly, indeed fairly cavalier in, in so that you give us one interpretation of what the district judge did. Our, my review of the record here does not find an inappropriate punitive reasoning in the determination of the judge pursuant to rule 16 or any other rule in the context in which this motion was made to deny it. I understand your honor. And I appreciate your candor in that, in that regard. I understand exactly what you're, what, what, what the court is driving at on that point. Can we turn to the, to the merits here for just a moment of your argument with respect to the Louisiana rule? That's about unmoored vessels. These were moored vessels. The district court seemed to say, I think did say, just doesn't apply because these were moored vessels. How's that, how's that wrong? Why is that incorrect? The district court, when district court was performing, first of all, the district court used the wrong standard for Louisiana. They used the 11th, the district court used the 11th circuit standard in the Fisher test. Whereas in this circuit, we have the Argonaut test and that Argonaut test is the Fisher test is an either or you just have to show one of three elements in order to overcut, to rebut the presumption. But, but am I right or am I wrong in my reading of the district court that it thought the rule just doesn't apply? It doesn't matter whether you're using the 11th circuit or any other circuits version of it. The court said it doesn't apply because these were moored vessels. The court, if I recall, your honor, the court's analysis began with the court's skepticism that there was ever even an impact. There was ever even any contact between the boat and the docks, but the court never made any findings on that. The court said the court is skeptical that there was, there was contact, but there were no findings of fact that this court could even look at to review to say whether that was, that that was properly found or not. The court just merely said, I'm skeptical. So at that point, then the court moved into the Louisiana analysis saying that the actions taken by reef transportation were reasonable under the Fisher test. I'll ask you then, does the Louisiana test not deal actually with moored, unmoored vessels, like unmoored vessels floating down and then striking another object? The Louisiana test and its progeny deal with drifting vessels and that can be unmoored I have read has indicated that they either slipped their moorings or the lines parted. Something occurred that caused it to be free and floating in whatever body of water, including argonaut. Yes, absolutely. Here though, what you have is an issue. That comes down to an issue of control and if you go back and you look at the Clarita, which was the predecessor to the Louisiana test, this was a situation where a tug was pulling a burning ferry and the ferry burned through the ropes on the tug and that burning ferry drifted over and lit another boat on fire. And the Supreme Court said that, you know, that's still the tug's fault. That is still, it's not, you know, the burning, the burning ferry was part of the tug. The tug had control of the ferry. So this is more of an issue of control. The lines that were attached, if you look at the before and after pictures that are in the appendix, the lines were slack in the water after the hurricane. They were drooping down into the water. So the way that they were moored, the way that they were tied up, gave a substantial amount of play for the movement of those boats within the slips. And that's where, this is about drift, this is about control, and at that point they were uncontrolled. They were not secured properly. Well now, didn't Reef come and get its boats immediately after the storm and said there was no sign of any hitting the docks or any other damage and they were still securely tied? And Crown didn't even begin investigating until two weeks after the boats had been removed. Your Honor, in the situation in the Virgin Islands after that hurricane came through was catastrophic. And at that point there were, my client was sleeping on the floor in his office for three months because there was, there were no hotels, there was no place to stay, power was off the entire time. In the exigent circumstances following the hurricane, that was not something that was necessarily immediately high on their list. They had other issues. There were boats that sank, there was another, our companion case, there was a large ferry that had broken away and slammed into the docks. There was a lot going on, Your Honor, and it was not a, it was in the midst of all of this trying to do insurance, trying to just get by at that point. It was something that they got to it when they could and then they, from there it moved forward. Assuming that... Prior to that, the boats had been removed without any sign of damage. That is... Your Honor, there was evidence that was, that Crown tried to admit in the trial proceedings that the court excluded on the basis of hearsay. It was a surveyor's report of a claims boat hit the docks, so that was part of it. There was also some indication that there was some damage on the rub rails, had fallen off. The... Well, the hearsay we don't consider, right? I'm sorry, Your Honor. The hearsay is not a notice. That is correct, Your Honor. I bring it up just to, by way of explanation, Your Honor, that's all. That's, that's, there, we were proceeding, it was not as if Reef had never conceded the point that their boats had hit the dock. They had, as a matter of fact, just couldn't get it in evidence. As a matter of fact, that's, that's the whole point of hearsay, is we're not taking that as a matter of fact. That's correct, Your Honor. Right? Absolutely. My colleagues will indulge me, I do want to ask about causation you've talked about. Look, you started talking about the fact that there was a bench trial here, the judge found certain facts, including paying attention to your client's who said that in, what, like 42 years of being an engineer, he'd never seen an instance where a concrete pier failed before the mooring lines broke. So, I mean, there's evidence here for the court to look at and pay attention to and say, it's my job to find the facts I find against you. When you've argued this causation point, and I guess I'm, I'm curious to understand how it is that when you've got no testimony to separate out prior damage and following damage, because Maria, I mean, you yourself a moment or two ago, you know, misspoke when you said Maria, I mean Irma. These were two back-to-back hurricanes. There was nothing, there's nothing in the record to distinguish damage from Irma and damage from Maria, is there? Other than the testimony of the expert witness that the, that Maria was a rain event. In St. Thomas, it was devastating on St. Croix, but in St. Thomas, it was, it was high winds and heavy rain. Your, the whole of your testimony is, your expert said it was pretty rainy, but it wasn't really a hurricane? That was, yes, your honor, because we're pushing back on the issue of judicial notice. The court took judicial notice of the fact that Maria was a Cat 5, and that is true. It was a Cat 5 in St. Croix, but the effects of the hurricane diminished significantly across the open water, and by the time those winds were in St. Thomas and, and in it was, they were significantly less, and so we argued in our briefing that that was an abuse of the judicial notice. With causation, again, we're back to the fact that the 11th circuit is an either-or. You can pick one of three ways to defeat the presumption. Under Argonaut, you don't, it's an and. You must show that there was no negligence, that there was no intervening negligence. So your, your, your causation argument falls back on your assertion that the, the Louisiana rule was wrongly applied? That the court applied the wrong Louisiana formulation. They should have applied the 3rd circuit's rule instead of the 11th circuit's rule. I gotcha. Judge Meade, anything else? Judge Roth? I have no further questions. Okay. Well, we'll, we'll hear you on the rebuttal, Mr. Stone. We gave you a lot of extra time to stand up, but we'll, we'll hear you on rebuttal two, and we'll, now we'll hear from Council for Reef. Thank you, Your Honor. I appreciate that. Morning, Your Honors. Justin Holcomb for the appellee, I'm sorry. Morning, Your Honors. Justin Holcomb for the appellee, Reef Transportation. Crown Bay, in this case, in this appeal, clearly wants a second bite at the apple. In other words, if it only had different facts, different experts, then maybe there would be a different result. But in the case below, as this court previously mentioned, there was a full trial and presentation of evidence by both sides. And what the facts showed is that Reef's two small vessels remain securely moored throughout Hurricane Irma. Well, yeah, let's get into that. Sure. Was it, should the, should the district court have paid more attention to the timing factor here? There's a lot of complaint from your colleagues on the other side that there was, there was ample time to do things like take those awnings off if they had been reasonable in their behavior, but they weren't. I understand. What's wrong with that argument? Why, why was it not, why did, did the district court not pay enough attention to that? Well, Your Honor, the district court in its opinion set forth the timing in some detail. One of the issues was Crown Bay wasn't even open to outside boats for, you know, I'd say a day before the storm hit. In fact, the owner didn't even know that outside vessels were being allowed into the marina. Well, no matter where you were going to put your boat, if you know a hurricane's coming. Right. And you can take the awning off the top. I mean, why would anybody say leave the full sails up in effect when the hurricane's here? Wouldn't the reasonable, sensible thing to do be to take those awnings off and to do that no matter where you were going to moor? Well, Your Honor, the court heard testimony from Mr. Thomas Dante, who's an expert in seamanship, and he testified that ideally you would maybe remove the awning and do some other things, right? Yeah. So there was things that could have been done better, but the standard in this case isn't perfection. It's reasonableness under the circumstances. This was a vinyl awning on aluminum. It's not like this is a strong structure that's made to like, you know, lift the boat out of the water. It's a, it's a, it's a vinyl awning. So while they could have done that, there was no evidence of it at trial. There was no presentation that that would have made a difference. That wasn't something Crown Bait argued at trial. What was argued, however, was set forth in the court's opinion. There was a, their expert presented what he thought would have been reasonable. Our expert presented what he thought would be reasonable. The court chose between the two, which under the, under the standard of review here is exactly right. I mean, she, she chose. That, that goes to the point that, uh, that Mr. Stone was raising, I believe, which is, uh, yeah, but if they heard from Dr. House, there would have been, uh, uh, a, a different outcome. You put the experts up against each other who the court did choose to hear and you get the outcome you got. But that only highlights the importance of the expert that got excluded. That's the, what I understand the other side's argument to be. Um, why, why doesn't penny pack factor five at that point play a more significant role than the district court gave it? Well, Dr. House was going to perform a wind tunnel analysis, right? This was something late in the game that they proposed only after their own expert, Mr. Ferreira said he didn't think there was any way you could measure this. I'm familiar with your timing argument. Okay. My, I'm trying to get you to respond to Mr. Stone's argument in the briefing and here at the podium today that the district court gave insufficient weight to penny pack factor number five, which is the importance of the evidence, the criticality of Dr. House's testimony. I want you to just like take it head on. Sure. The court did, the court acknowledged that this could be potentially important expert witness. The court held a full hearing and heard from attorney Weiss for Crown Bay. He made that argument, but what the court found is that there would be substantial prejudice that this late in the game, it would be difficult. Now, as far as the wind tunnel, there was a lot of issues that didn't address, and I can address that now. The, um, one of the things the court pointed out, there was a problem with Mr. Ferreira's testimony is it didn't consider the underside of the dock, the condition of the underside of the dock. So these models, there's no way that that mimicked a 30 year old marina that had rust and concrete cracking. There's no evidence that the vessels were the same as the fiberglass vessels that issue here. There's no evidence that the tensile strength of the lines used to these models the same. So there's a lot of problems with it. Honestly, your honor, I don't think it would have made any difference. And even if, even if this was admitted, the proximate cause issues with respect to the condition of the marina, they still wouldn't be able to overcome that because they don't have any proof that the marina was in good shape prior to the storm. So I think the outcome would be the same. You're in the briefing, you say that what you've just said here, which is that testimony wouldn't have changed the result of the case, but doesn't that require us to make a series of assumptions? I don't think the court, you've just, you've just given us like statements about there was this problem and that problem with Dr. House's testimony. Those would be the sort of things that would get tested by cross-examination, right? Yes, your honor. But I don't think the court needs to be in that position based on the standard overview, which is an abuse of discretion standard. The court was correct. The court didn't abuse its discretion. It was reasonable. It had, in its opinion, set forth the reasons why it chose to exclude the expert. I think a great example is the Constantopoulos case the third circuit decided. That's similar to this where someone late in the game wanted to introduce an expert. There's other decisions the third circuits decided where a party may have a strategic maneuver like this and think, you know, it'd be great if we got in this expert to bolster our case, but it's just not, it's just not allowed for obvious reasons. What's your answer to the that Dr. House's testimony was excluded primarily because the district court misunderstood or wrongly thought this was a discovery sanction as in Rule 37 when there hadn't been an outstanding order to be violated and therefore, yeah, a conflation of 37 in Rule 16 standards. I don't think so, your honor, that what the court looked at was the penny pack analysis and both sides agree. The court went through that analysis and considered, you know, the stage with this, which this was brought, the prejudice and the willfulness. This was willful. They knew all along that lateral pulling was the argument they were trying to make. And so they could have, they could have approached Dr. House two years before they did, and they chose not to. And the only reason they did was pure strategy. The court made the right decision, as you pointed out and not. Does that answer the assertion? I mean, they're making a legal point, which is this is that language from the court's opinion indicates a punitive sanction for violating a discovery order, which is a Rule 37 standard. When we're, it should have been assessing this under Rule 16. The obviously disagreed with that, but what's, where is Mr. Stone got that wrong? With respect to the rule, your honor? With respect to his assertion that that's the rule that was being applied. As a punitive standard? Yeah. Well, the court went through the Pennypack analysis, your honor, and she outlined how each factor would play out. And the issue of willfulness and bad faith was one of those factors, but it wasn't purely punitive. I mean, the court held an evidentiary hearing, heard testimony from both sides. It wasn't something that was purely a punishment. Not only that, there was an issue of how they, of the disruption of trial. They had agreed multiple times to this schedule. This is not something that, you know, they should be able to, at the last minute, simply change their mind and have this expert. If you shift over to the Louisiana rule, you want to take on directly the assertion that the court just, well, the first thing I'll ask is, does the rule apply at all? No, your honor. Because? Because these vessels were securely moored, they didn't break their moorings, remained in their slips throughout the Category 5 hurricane, so it doesn't apply at all. So why is the district court talking about it? It's sort of a, I would say, like dicta in a court opinion, like even if the rule, even if the vessels broke their moorings or even if they moved. But that's an unusual characterization of dicta, right? I mean, typically a stray phrase here, an extra site there. I would certainly understand that as being characterized as unnecessary to the whole thing. But this is a bit more than that, right? So let's assume you're correct, Louisiana has no import here. Then why is the district court spending so much time with it? So much so that it gets into the Fisher standard out of the 11th circuit. So help me understand what all of that, how we should read all of that. Well, the Louisiana rule doesn't apply, as I just said. But the court's decision basically walks through whether or not, if it did apply. And as this court knows, the Louisiana rule has to do with a vessel that's breaking free of its moorings. So it went through the analysis basically to say even if the rule applied, REEF had shown reasonable care under the circumstances. It cited Mr. Dante's testimony, it cited the timeline here, cited the engineering experts. So it was looking at reasonableness, which is the standard in a negligence case. As we've said in our briefs, this court decided a case many years ago in which it said that the Louisiana rule presumptions disappear once both sides present evidence. And that's the Pennsylvania Railroad case. So we would think, we think that the court could have just totally foregone the analysis and simply looked at the parties' respective positions. But by undertaking that was simply looking at reasonableness under the circumstances, which is the standard. Answer the argument from the other side that our own case, the Argonaut case from the 50s, emphasizes that you've got to show that the collision was unavoidable. That's an inevitable accident case, Your Honor. That's a different situation entirely. Inevitable accident is like a sudden storm comes along and you have no time at all to prepare. As we've said in our briefs, the cases cited by Crown Bay are totally different. It's not something that the court considered. The whole in extremis argument, again, not something the court considered. So I would say that case is inapplicable, Your Honor. Okay. And finally, you want to turn to the disqualification argument for just a moment, please. Sure. In particular, I'm concerned with or I'm interested in hearing your argument about the problem-tenant interaction that they had earlier had and whether that, whether there's a presumption that some important or confidential information associated with the applicability or the enforceability of the license agreement should be understood to have been relayed in that context. So you understand what I'm asking? That was maybe a little poorly. If you could repeat that, I'm sorry. I was trying to. All right. So there's a, if I understand it right, under the model rules, if you're talking about, and their assertion is that you were talking with them in the distant past, but you were talking with them about the license agreement, which is effectively still the wording in the license agreement today, and that there was some opinion rendered about that and that it came up in the context of this problem-tenant, that how could you enforce this license agreement to get rid of a problem-tenant? That I understand is their argument or something like that. And I'm wondering if you'll answer that. Is it, is it not, we don't have to get into it too much factually, if in fact there's a presumption that confidential information was relayed. Your Honor, the confidential information in this case, this was in the background of this was, there was a closing for the predecessor entity for Crown Bay, right? And so the documents came from Texas, from that predecessor entity, and our firm reviewed it to make sure these boilerplate documents could be used in the Virgin Islands. So there were some changes made in that respect. There wasn't confidential, there was never a showing in the case below of confidential information. Throughout that hearing, all that was stated was they'd worked on these documents. So under Rule 1.9. But there was a later, right? There was a consultation about a problem-tenant. Correct, Your Honor. The problem-tenant. That's the one I'm asking about. Okay. The problem-tenant, the relationship there, it was a 1999 fax that was sent to the law firm with two sections called out. And the billing records were presented in the case below to indicate that basically 20 years ago there was a call about whether or not how the these two sections, whether or not they could use them to basically call out the tenant for its conduct, essentially. So it was a specific situation related to a tenant back then. So it is dealing with the enforceability of the license, right? With respect to a particular tenant, it was not generally or not, you know, forevermore that this license would be, for all situations, appropriate. I thought the fax said, please sign a copy of our license agreement for your review. Over the next days, everybody reviews it and gives an opinion as to the license for termination provisions. And their point is, well, that's what we're arguing about as the enforceability of the licensing agreement. So how is that not the same matter? Well, it was a specific situation 20 years ago, and it wasn't for general use as far as like this is good for every situation. Also, there's no relationship at all. Could it have been a general review of the licensing agreement 20 years ago? Would you still make the same argument? I mean, are you focusing on the specificity or the temporal or both? Well, it was a specific situation. It was a specific problem they had, and the firm was reviewing it to deal with that particular problem, applying it to that problem. It wasn't reviewing it for like general use as something that you could use for all situations and all clients. In fact, the first review was only to basically get it in line with Virgin Islands law. This review was to deal with a problem tenant. That's what the testimony in the court below showed. So we argued in the case that it was not substantially related. And clearly, if you look at the timeline here, this is something that was raised very late in the game by them. It was a strategic maneuver. They knew about the relationship and didn't even on appeal raise the issue of waiver, which I think is significant. So you want to comment at all on the interim allegation here that this was a response to bad acts on your side of the table, threatening to send their person? There was no evidence of that at all in the hearing, Your Honor. I would challenge them to cite where they raised that issue in the trial court. If that was something that they believed to be true, they didn't mention it. You know, the court fully considered what the parties raised at that hearing. Lawyers from my firm were witnesses. Mr. Ono was also a witness at the hearing. So the court basically weighed the evidence, and under an abuse of discretion standard, she's entitled to deference in her opinion. Okay. Judge Roth, anything further? I have no further questions. Okay. Thank you, Mr. Holcomb. We'll hear from Mr. Stone on the vote. Thank you, Your Honors. Could have done better under the circumstances. They freely admit they could have done better under the circumstances. In a Louisiana analysis under Argonaut, that's not good enough. Well, wait a second. When you say under Argonaut, I want you to, this is your rebuttal time, rebut what Mr. Holcomb said. He's made the point, and I think they said it in their brief, too, that Argonaut is just, Argonaut's looking at one specific different kind of circumstance, the unavoidable accident. And this is not that case. So reliance on Argonaut is misplaced. What's your answer to that? Argonaut dealt with a, Argonaut specifically said it was dealing with a drifting vessel case, or a drifting vessel. Where there's a drifting vessel, there's a presumption under Louisiana that the drifting vessel is, so if the facts of it were dealing with a unavoidable accident, that was an affirmative defense that the defendants in that case raised. The court looked at that. It broke down what the elements of unavoidable accident were, announced that, and then said, but when you're dealing with a drifting vessel, the Louisiana rule says that you must show that there was a, you know, no amount of precaution, human skill. We may be talking past each other. In Argonaut, we said that the district court had erred, and we said it, and the quote, the language is that it erred in the application of the inevitable accident case. And I understand Mr. Holcomb's argument on behalf of Reef to Be, this is not an unavoidable accident case. But correct, your honor, but it should have been, because, I'm sorry. Well, when you say it should have been, why should it have been? Why is this, I mean, part of your argument is, this was not an unavoidable accident. This was an entirely avoidable accident with sensible preparation. You take the awnings off, and you moored the ship. We wouldn't have had an issue. It's the farthest thing from an inevitable accident case. Why, I'm just, it feels like you're going back and forth to me, and I'm wanting you to meet his argument that your reliance on Argonaut is inconsistent with your assertion that there was, that they wasted time, and they could have done things, so it wasn't inevitable. What's the response to that? The response would be that Argonaut was cited for its breaking down of what the Louisiana standard is. On the facts, you're absolutely correct, your honor. It does not apply. But when you're talking about what the role that inevitable accident plays in a drifting vessel case, that is what we have here, the idea of drifting vessel. We never said in the Argonaut that there's only one way that you can defeat a presumption of negligence. I mean, it's not even our law. This is Supreme Court law. The Clarita case says there are three ways you can deal with it, right? Clarita points out this collision occasion by the fault of the other vessel, or the inevitable accident, or the third one there, what is it? I don't know. You demonstrate there's no fault on the other side. So there's different ways you can, according to the Supreme Court's precedent, different ways you can do it. You're focusing us on one application, the inevitable accident piece, which was what Argonaut was focused on, and I'm just, maybe I'm just beating this horse and it's dead already. I'm just struggling to when they say that's not our circumstance and we could prove that Louisiana presumption is rebutted, even if Louisiana rule applies, using two other means. You seem to be saying there's only one way, inevitable accident way. Am I misunderstanding your argument? No, Your Honor, you've pretty much nailed it there. Then answer their argument, which is that's just not so under Third Circuit or Supreme Court law. The Clarita rule holds. There are three different ways you can do this, and we're not in the inevitable accident category. Clarita was dealing with a vessel moving under power, the tug in that case, because that's the Oregon standard. That becomes the Oregon rule. The Oregon rule does have those three elements that the 11th Circuit put in their Fisher rule. I mean, what happened was, it's interesting, if you go back and you look at the cases, if you start with Fisher and start moving backwards, Fisher goes back through about three or four cases. They hit on a Eastern District of Pennsylvania case in 1962 that is, and I'm sorry, Your Honor, just beg your indulgence, but yeah. Just answer this, and this will help me. Am I correct that your assertion is, as a matter of precedent, under Argonaut is, there's only one way to rebut the presumption that the Louisiana rule opposes, and that is the rule, the inevitable accident piece? Absolutely, Your Honor, whereas the 11th Circuit conflates Oregon, the Oregon rule, and the Louisiana rule. It jams them together, and that happened because it misread an Eastern District of Pennsylvania case back in 1962 that itself cited a 9th Circuit case, which was an Oregon case. So that's where we have now Fisher, where you do have, it's an either-or situation, whereas in the third, it is an and situation. You got to show both. You got to show all the elements. I understand your argument. Your Honor, I'm sorry. Wait, Your Honor, I'm just going to hear it in the room. 30 seconds. 30 seconds. You are way over. Thank you, Your Honor. I do appreciate it. You know, conflict of interest is important in a small jurisdiction like this. Our district court has found that. You know, Attorney Holcomb, myself, the judge below, we all worked for the same firm, the same firm that's at issue that represented Reef. So we have to be very clear on what conflicts of interest, and we have to identify those. Pure strategy, you know, the court found that there was no maliciousness on the part. This is, I'm sorry, this is back to the exclusion of Dr. House. Didn't find that there was any maliciousness, and I always tend to, you know, don't ascribe to malice what can be, you know, ascribed to a failure of judgment or a fog of war. That's what I would say about that. You got your argument, Mr. Stone. Thank you. Thank you very much, Your Honors. We appreciate it. Thanks. Any further questions, Your Honor? I'm sorry. Thank you. All right. We've got the matter under advisement, and we will recess court. Thank you very much.